IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| BARBARA CURRAN,<br><br>            Plaintiff<br><br>                        v.<br><br>RADIAGUARD INTERNATIONAL INC., et al.,<br><br>            Defendants | CIVIL NO. 05-1725 (ADC/MEL) |

**REPORT AND RECOMMENDATION**

**I.    PROCEDURAL BACKGROUND.**

On June 30, 2005, plaintiff Barbara Curran ("Curran") filed the complaint in this case against: (1) Radiaguard International, Inc. ("RGI"); (2) Hope Medical Products, Inc. ("HMP"); (3) Ms. Lucy Sugg ("Ms. Sugg"); (4) her husband Mr. Thomas Sugg ("Mr. Sugg"); and (5) Mr. Jeffrey L. Pombert ("Pombert") (collectively, "defendants").  (Docket No. 1, ¶¶ 1-13.)[1]  The complaint seeks declaratory and injunctive relief, as well as damages caused by defendants' alleged fraud, misrepresentations and breach of contract.  Id., § I.  Federal jurisdiction is premised on the diversity statute.  28 U.S.C. § 1332.

On July 1, 2005, plaintiff filed a separate motion requesting a temporary restraining order ("TRO") and preliminary injunctive relief against defendants. (Docket No. 2.) The TRO was denied without prejudice on October 5, 2005 (Docket No. 38) and the request for preliminary injunction was

---

[1] On February 10, 2006, Curran and Pombert filed a Joint Motion for Voluntary Dismissal informing the court that they had reached a settlement agreement and requesting that the complaint against Pombert be dismissed.  (Docket No. 58.)  On March 15, 2006, the court entered a partial judgment dismissing the complaint against Pombert with prejudice.  (Docket No. 62.)

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

held in abeyance, pursuant to a stipulation by the parties, on August 23, 2005 (Docket Nos. 20, 23 and 24).

On September 30, 2005, RGI, HMP and the Suggs requested dismissal of the complaint on several grounds: (1) lack of personal jurisdiction over defendants for failure to satisfy the due process minimum contact requirements; (2) lack of indispensable parties; and (3) improper venue. (Docket No. 33.)[2]  After several requests for jurisdictional discovery, Curran opposed the request for dismissal on January 22, 2007.  (Docket No. 68.)  RGI, HMP and the Suggs replied on February, 2, 2007.  RGI's, HMP's and the Suggs' motion to dismiss (Docket No. 33) was eventually referred to the undersigned for a report and recommendation.  (Docket No. 74.)

## II.   SUMMARY OF THE FACTUAL ALLEGATIONS OF THE COMPLAINT.

Curran is a resident of Puerto Rico, dedicated to the business of promotion and sales of medical products in the United States, including Puerto Rico, and internationally.  RGI and HMP are  corporations organized and existing under the laws of the State of Georgia.  These two entities have their principal place of business as well in Georgia and are dedicated to the distribution and sale of products for the treatment of adverse skin reactions in cancer patients undergoing radiation therapy (the "Products").  Ms. and Mr. Sugg are, respectively, the president and "executive' vice-president of RGI and HMP, and residents of Georgia.  Radx Marketing Division is an inactive corporation that was organized and existed under the laws of Georgia; it distributed and sold products which were the functional equivalent of the Products.  (Docket No. 1, ¶¶ 1-5, 11.)

---

[2] Also on September 30, 2005, RGI, HMP, and the Suggs answered the complaint and filed a counterclaim against Curran, without submitting to this court's jurisdiction and "with full reservation of all the defenses included in the [a]nswer to [c]omplaint and the [m]otion to [d]ismiss."  (Docket Nos. 35, 36.)

In 2002, the Suggs were doing business as "Radx Marketing Division" and as "Southeast Sun Products, Inc.", selling essentially the same Products as RGI and HMP.  At that time, Curran was engaged in the distribution of sunscreen products to customers in Puerto Rico.  In or around August, 2002, Curran met the Suggs in Los Angeles, California, during a distributors meeting organized by Sunscreen International, Inc. ("SII") which was one of the companies whose products Curran distributed in Puerto Rico.  At that moment, the Suggs and SII's owner, Mr. Stephen Finley ("Finley"), were involved in the process of creating a new company for the marketing of Finley's new line of products called "Radx" (the "Radx Products").  The Radx Products later became one of the Products sold by HMP and the Suggs.  Id., ¶¶ 16-19.

At the August 2002 meeting, the Suggs invited Curran to work with them and the new company in the marketing and distribution of the Radx Products.  From that moment until approximately January, 2004, the Suggs allegedly employed Curran as a sales representative for Radx Marketing Division, developing leads and procuring customers for the Radx Products in the United States, including Puerto Rico.  In the beginning, Curran worked on a commission basis only.  From 2002 to 2003, Curran was paid a total of $2,012.44 in commissions.  The sales of the Radx Products in 2002 and 2003 failed to meet the Suggs' expectations and yielded minimal commissions to Curran.

In the spring of 2003, Curran requested to be paid a salary for her services.  Ms. Sugg agreed to pay Curran an annual salary of $48,000.00.  The Suggs, however, did not pay Curran's salary because they were not able to obtain investment capital or other financing for the new business during the late 2002 and throughout 2003.  During that time, Curran lived off out of her savings.

3

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

The only payment that the Suggs made to Curran during the year 2003 was a Christmas bonus of $150.00 in December.  Id., ¶¶ 20-31.

SII terminated its business relationship with the Suggs by January, 2004.  In or about February, 2004, Curran and the Suggs came up with the idea of forming a new corporation to market modified versions of the products sold by SII, but without SII's or Finley's participation.  After discussing this idea in February 2004, Curran and the Suggs agreed to form a new corporation, HMP, to procure the manufacturing, marketing and selling of said products (the "New Products").  They agreed that Curran would own thirty-three and one-third percent of the shares of the new corporation, while the remaining sixty-six and two-thirds percent of the shares would be owned by the Suggs. They also agreed that Curran would be responsible for the business development of HMP, including the marketing, promotion, and sales of the New Products which, at Curran's suggestion, were named "Radia-Guard." (the "HMP Agreement").  Id., ¶¶ 32-39.

From March, 2004, through September, 2004, HMP was preparing for the marketing and sale of the New Products.  In April, 2004, Ms. Sugg prepared a business plan to support HMP's efforts to raise investment capital and/or to obtain other financing (the "RadiaGuard Business Plan").[3]  The Suggs, however, were once again unable to obtain either investment capital or other financing for HMP.  For that reason, in June 2004, Curran, acting upon the belief that she was the owner of one-third of HMP's shares of stock, arranged a 90-day "bridge loan" to HMP (the "Bridge Loan"), obtained from Curran's personal friend, Janet Catanese ("Catanese"), a resident of the State of New

_____

[3] Pursuant to the RadiaGuard Business Plan, HMP's Management included Curran and the Suggs, who are described in the plan as "[t]hese business owners."  (Docket No. 1, ¶ 44-46.)

4

<u>Barbara Curran v. Radiaguard International, Inc., et al.,</u>
Civil No. 05-1725 (ADC/MEL)
<u>Report and Recommendation</u>

York.  The Bridge Loan was personally guaranteed by Ms. Sugg.  On June 16, 2004, Ms. Sugg

executed, personally and for HMP, an "Unsecured Short-Term Personal Loan" in favor of Janet

Catanese, in the amount of $25,000 (the "Bridge Loan Agreement").  <u>Id.</u>, ¶¶ 40-53.

Curran expended much time "transferring" leads and customers for the New Products from

leads and customers which she had developed for the Radx Products.  Said customers included

hospitals, CVS, Walgreens and other pharmacies in the United States including Puerto Rico.  In

addition, Curran spent many hours developing marketing plans, editing all the marketing materials

and labels of the New Products, and gathering all the documentation necessary for the marketing and

sale of these products.  Curran was only partially compensated for these services to HMP. She was

paid approximately $15,700.00 for her work from January through September, 2004.  This

compensation was paid from Mr. Sugg's personal funds, from proceeds of the Bridge Loan, and from

HMP's sales proceeds of the New Products.  <u>Id.</u>, ¶¶ 54-62.

By that time, HMP and the Suggs had incurred in approximately $100,000.00 in debt from

Radx Marketing Division ("Radx Debt"), which Ms. Sugg had transferred to HMP for no

consideration, plus an additional debt in the amount of $25,000.00 from the Bridge Loan.  Mr.

Luciano González ("Mr. González"), a personal friend of Curran, shared his interest in investing

$100,000.00 in the RadiaGuard business, but objected to the idea of making such an investment on

HMP because of the Radx Debt.  Curran insisted to the Suggs that the New Products be marketed

through a new corporation, not through HMP, in order to encourage Mr. González and other

investors to invest in the RadiaGuard business.  The Suggs agreed ("RGI Agreement"). In particular,

the Suggs and Curran agreed that: (1) the new corporation would be called "RadiaGuard

International, Inc" and that it would conduct the RadiaGuard business not burdened by the Radx

Debt; (2) Curran would receive thirty-five percent (35%) of RGI's shares; (3) the Suggs would

receive the other sixty-five percent (65%) of the shares; (4) Curran would receive the additional

difference between thirty-three and one-third percent in HMP and thirty-five percent (35%) in RGI

in consideration of the fact that HMP had assumed the Radx Debt and would be receiving licensing

fees from RGI to repay the Suggs' Radx Debt; (5) HMP would license the product formulas to RGI,

allowing HMP to profit from product sales so that the Suggs could repay the loans of HMP; and

(6) Curran would be RGI's Vice President, responsible for the business development for the New

Products in the international market and in Puerto Rico.  The purpose of the RGI Agreement was to

establish Curran's participation in the RadiaGuard Business and to substitute the HMP Agreement.

Id., ¶¶ 63-76.

RGI and Ms. Sugg did not pay the Bridge Loan when it became due on September 15, 2004.

When Catanese learned from Curran that HMP and Ms. Sugg had no funds with which to pay the

Bridge Loan, she suggested to Ms. Sugg to convert the Bridge Loan into equity in HMP.  Ms. Sugg,

however, offered Catanese shares in RGI in exchange for the money due on the Bridge Loan.  Id.,

¶¶ 81-84.

RGI was incorporated on September 20, 2004, without the Suggs giving notice of such

incorporation to Curran or sending her a shareholders agreement or any shares in RGI.  It was

Curran's understanding, however, that after RGI was incorporated, the Suggs would process all sales

and all income from sales of the New Products through RGI.  Notwithstanding RGI's incorporation,

the Suggs continued to process the New Products' sales proceeds through HMP.  According to

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

Curran, RGI never sold any of the New Products, owned any property, real or personal, and never received any income from the sale of the New Products or any other source. Id., ¶¶ 85-97.

Curran also never received stock certificates to evidence her ownership in HMP or any other compensation for her interest in HMP. All of the proceeds received from the sale of the New Products in Puerto Rico and elsewhere were received and processed by the Suggs, through HMP, and none of said proceeds were either received or processed by RGI. Even though the Suggs continued to conduct the RadiaGuard business through HMP, Curran insisted that the same be conducted through RGI, not through HMP, and continued to perform her duties and responsibilities with RGI. The RadiaGuard business and all HMP and RGI corporate and business material was kept under tight control by the Suggs in Georgia. Id., ¶¶ 98-103.

By March, 2005, HMP and Ms. Sugg had still not paid Catanese the amounts owed under the Bridge Loan. Even though RGI had no assets and conducted no business, HMP and Ms. Sugg sought to convert the Bridge Loan into RGI equity. In particular, Ms. Sugg sought to convert the principal amount of the Bridge Loan ($25,000.00) into 100 shares of RGI stock, valued a $250.00 per share. On April 15, 2005, Catanese e-mailed Pombert requesting information as to the percentage of RGI stock which was represented by the certificate for 100 shares of RGI stock which Ms. Sugg had sent to as an exchange for the cancellation of the Bridge Loan, the total number of issued shares of RGI stock, and the method for valuing RGI. Pombert answered Catanese's e-mail on April 18, 2005, and informed her that RGI had 10,000 shares, and that the 100 shares of RGI stock represented one percent (1%) of RGI's stock. Catanese advised Pombert that she was not interested in converting the Bridge Loan into equity in RGI because the 100 shares of stock in RGI

for $25,000 meant that RGI was being valued at $2.5 Million, which she thought was "unbelievable, since [the Suggs] were unable to make payments on a $25,000 loan." Id., ¶¶ 103-13.

In late April 2005, Curran requested a meeting with the Suggs in Georgia to discuss the future of her business relationship with them in light of the lack of money to develop the international market for the New Products. Curran requested to Pombert her stock certificate evidencing her shares of stock in RGI and a copy of the shareholders agreement between the Suggs and her.

Curran and Ms. Sugg met on May 8, 2005. In said meeting, Curran advised Ms. Sugg that Catanese's husband, Mr. Anthony Catanese, was interested in providing financial support to Curran (not to HMP, RGI or the Suggs), in order to engage in the international marketing of the New Products. Curran also presented Ms. Sugg with a proposal for licensing the New Products for all international markets, which they drafted, negotiated and executed during the meeting. Said agreement states that: "After the signing of the formal agreement, Barbara Curran will return 25% of her ownership stock shares of RadiaGuard International, Inc., and will keep 10% ownership shares." Then Ms. Sugg showed Curran the stock certificate of her shares in RGI, which was signed and dated September 20, 2004 (the "RGI Share Certificate"), but advised her that said stock certificate would not be delivered to Curran until she executed a "Confidentiality and Non-Solicitation Agreement" which had been prepared by Pombert. Curran signed the "Confidentiality and Non-Solicitation Agreement" and backdated the same to September 20, 2004 (RGI's incorporation date), pursuant Ms. Sugg's instructions. When Curran returned the executed "Confidentiality and Non-Solicitation Agreement" to Ms. Lucy, she allegedly "slipped" the

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

certificate into several documents on top of Curran's briefcase.  At that moment, Curran did not

inspect the documents to verify whether the stock certificate was there.  She found out later that the

document that Ms. Sugg had "slipped" into plaintiff's papers was a handwritten unsigned and

undated certificate for 3,500 shares of stock in RGI.  Id., ¶¶ 122-39.

On May 9, 2005, Ms. Sugg sent a letter to Curran informing her that the Suggs had discussed

the Licensing Agreement and decided that it was not an agreement, that it contained an erroneous

assumption that Curran had a thirty five percent (35%) stock ownership in RGI, and that RGI was

withdrawing the offer to issue stock to Curran.  The letter further informed that RGI had determined

that it was not in the company's best interest to continue working with her and, therefore, that RGI's

business relationship with Curran was terminated.  The letter also advised that Curran could not

disclose confidential information or trade secrets from RGI pursuant to the "Confidentiality and

Non-Solicitation Agreement" and requested Curran that she forward Ms. Sugg the international

accounts and contacts, as well as all other information developed while she was a paid representative

for RGI and HMO, in order to allow Ms. Sugg to resume contact with said clients.  Id., ¶¶ 140-45.

## III.    STANDARD UNDER FED.R.CIV.P. 12(B)(2).

Under Fed.R.Civ.P. 12(b)(2) ("Rule 12(b)(2)"), a defendant may request dismissal of an

action asserted against him for lack of personal jurisdiction.  Since federal courts are courts of

limited jurisdiction, the party asserting jurisdiction has the burden of demonstrating that jurisdiction

exists.  See United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001); Ealing Corp.

v. Harrods Ltd., 790 F.2d 978, 979 (1st Cir. 1986); Dalmau Rodríguez v. Hughes Aircraft Co., 781

F.2d 9, 10 (1st Cir. 1986).  In order to show that the forum state has personal jurisdiction over a

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

defendant, the plaintiff must make a *prima facie* showing "as to every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution." Harlow v. Children's Hosp., 432 F.Supp.2d 50, 57 n. 3 (1st Cir. 2005); see also Boit v. Gar-Tec Products, Inc., 967 F.2d 671 (1st Cir. 1992).

The *prima facie* standard requires the district court to determine "whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." Id. at 675. This determination must be based on affirmative evidence of specific facts set forth in the record. Steen Seijo v. Miller, 425 F.Supp.2d 194, 198 (D.P.R. 2006) (citing Kowalski v. Doherty, Wallace, Pillsbury & Murphy, 787 F.2d 7, 9 (1st Cir. 1986); see also Swiss Am. Bank, Ltd., 274 F.3d at 619; Gar-Tec Prods., Inc., 967 F.2d at 675 (stating that mere references to unsupported allegations in the complaint are insufficient to establish personal jurisdiction). Therefore, the district court will accept plaintiff's asserted facts as true so long as they are properly supported by the evidence in the record, and the district court will make its ruling as a matter of law and not as a fact finder. Swiss Am. Bank, Ltd., 274 F.3d at 619; see also Steen Seijo 425 F.Supp.2d at 198. "Unsupported allegations in the pleadings do not contribute to the *prima facie* showing of personal jurisdiction"; said showing "must be based on evidence that goes beyond the pleadings." Steen Seijo, 425 F.Supp.2d at 198 (citing Chlebda v. H.E. Fortna & Bro. Inc., 609 F.2d 1022, 1024 (1st Cir.1979); Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir.1995) ("The plaintiff ordinarily cannot rest upon the pleadings but is obliged to adduce evidence of specific facts.")).

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

## IV.   LEGAL ANALYSIS.

### A.   Denial of the request to summarily deny the motion to dismiss for failure to produce jurisdictional discovery.

RGI, HMP and the Suggs filed the pending motion to dismiss on September 30, 2005. (Docket No. 33.)  On November 8, 2005, more than one month after the request for dismissal was filed, Curran filed a "Motion Requesting Jurisdictional Discovery" claiming that, in order to properly oppose the motion to dismiss, she needed to conduct discovery strictly limited to the issue of minimum contacts between RGI, HMP and the Suggs with the Puerto Rico forum.  (Docket No. 42.) Curran attached to this motion two letters, dated November 3 and 4, 2005, addressed to defendants' counsel, asking whether they would agree to conduct limited discovery on the issue of RGI's, HMP's and the Sugg's contacts with Puerto Rico.  (Docket No. 42, Exhs. 1, 2.)  The letters specified the discovery mechanisms that plaintiff intended to employ and the issues to be covered by said discovery.  (Docket No. 42, Exh. 1).  RGI, HMP and the Suggs allegedly did not answer these letters. Notwithstanding, Curran also alleged that she had "already gathered evidence that will demonstrate that, indeed, Defendants ... have incurred in behavior which meets the standard for minimum contacts[;] however, the Discovery Requests sought will allow this Honorable Court to determine the extent of Defendants['] ... contacts with this jurisdiction."  (Docket No. 42, ¶¶ 7-13.)

The court granted Curran's request for limited discovery on November 11, 2005 (Docket No. 45).  In particular, the court granted until December 14, 2005, to conduct said discovery, and until January 3, 2006, to oppose the request for dismissal.  Id.  On November 11, 2005, RGI and the Suggs moved the court to reconsider its decision claiming that the court had granted Curran's request

11

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

without allowing them an opportunity to oppose the same and that said request was unnecessary in view that Curran had manifested that she had already gathered evidence that would demonstrate the existence of minimum contacts. (Docket No. 46.)[4]

Curran served discovery requests upon RGI, HMP and the Suggs on December 2, 2005. (Docket No. 49.)  Plaintiff's counsel also informed the court that they had attempted to contact defendants' counsel by telephone in order to ascertain whether RGI, HMP and the Suggs intended to comply with the November 3, 2005, "informal" discovery requests or the order issued by the court on November 11, 2005.  According to plaintiff's counsel, defendants informed that they had no intention of providing any responses to any discovery request until the court's ruling on the motion for reconsideration.  (Docket No. 49, ¶¶ 11, 12.)  The court denied the motion for reconsideration on December 5, 2005, and extended the deadline for the limited discovery until January 14, 2006, and the deadline for the opposition to the motion to dismiss, until February 3, 2006.  (Docket No. 50.)

On January 17, 2006, RGI, HMP and the Suggs requested an extension of time until January 31, 2006, to comply with the order issued by the court on December 5, 2005, and answer Curran's discovery requests.  (Docket No. 52.)  The court granted defendants' request and extended the deadline for Curran to oppose the motion to dismiss until February 21, 2006.  (Docket No. 53.)

On February 6, 2006, Curran filed a "Motion Seeking Denial of Defendant's Motion to

_____

[4] RGI and the Suggs also argued that Curran's limited discovery request was belated and that the request for dismissal was duly supported by a sworn statement executed by the Suggs stating that all the events giving rise to the claims asserted in the complaint occurred in the State of Georgia, not in Puerto Rico.  (Docket No. 46, ¶¶ 4, 5.)  HMP did not join the motion for reconsideration.

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

Dismiss" requesting that the motion to dismiss be denied for defendant's failure to produce the requested discovery. (Docket No. 57.) Curran reiterated this request on February 16, 2006. (Docket No. 59.) The court denied both motions on May 10, 2006, citing Local Rule 26(b), which states, in its pertinent part, that "[t]he judicial officer shall not consider any discovery motion that is not accompanied by a certification that the party has made a reasonable and good faith effort to reach an agreement with opposing counsel on the matters set forth in the motion. An attempt to confer will not suffice." (Docket No. 65; L.Cv.R. 26(b).)

The record reflects that no further activity took place in this case (except for a motion to withdraw from legal representation that was filed in error on May 19, 2006) from May 10, 2006, until January 11, 2007. (Docket No. 66.) On January 11, 2007, the court issued an order stating: "Ample time for discovery has progressed. Plaintiff is granted 10 days to file an opposition to defendants' Motion to Dismiss (at Docket No. 33 )." (Docket No. 67.)

On January 22, 2007, Curran filed an opposition to the request for dismissal. (Docket No. 68.) In said opposition, Curran claims that the request for dismissal should be summarily denied due to defendant's failure to comply with the court's orders to produce the jurisdictional discovery requested by Curran. As a result, according to Curran, she is unable to properly oppose the request for dismissal and the court is not in a proper position to adjudicate the merits of the motion to dismiss. (Docket No. 68, at p.1.) In the alternative, Curran argues that despite defendant's lack of compliance with the court's orders, the motion to dismiss should be denied because defendants' actions satisfy the minimum contacts necessary for the court to have personal jurisdiction over them. (Docket No. 68)

13

<u>Barbara Curran v. Radiaguard International, Inc., et al.,</u>
Civil No. 05-1725 (ADC/MEL)
<u>Report and Recommendation</u>

On February 2, 2007, defendants replied to the opposition to the request for dismissal. (Docket No. 71.) Defendants assert that Curran's opportunity to obtain jurisdictional discovery had "obviously expired" because, after serving the discovery requests on December 2, 2005, Curran "never again ... served a single communication to [defendants] following up their [sic] request." <u>Id.</u>, ¶ 8.  Defendants also contend that the court's orders regarding the jurisdictional discovery "were limited to extending the established deadlines for plaintiff to conduct limited discovery regarding the 'minimum contacts' issue, not to order codefendants to produce any such information." <u>Id.</u>, ¶¶ 8-13.  Finally, defendants assert that it was Curran who failed to prosecute her case, that the fact that the court twice refused to deny the motion to dismiss for failure to produce the discovery and that Curran managed to file an opposition to defendants' request for dismissal underscores the frivolity of the discovery requests. <u>Id.</u>, ¶¶ 8-13.

In light of the above, on September 9, 2008 the court granted Curran until September 16, 2008, to supplement her opposition to the motion to dismiss with specific information regarding her requests to defendants for jurisdictional discovery between May 10, 2006, and January 11, 2007. (Docket No. 76.)  The court ordered Curran to: (1) "specifically detail the particular matters and evidence requested from defendants and when between May 10, 2006, and January 11, 2007, were these requests made"; (2) "submit supporting documents or any other evidence showing any additional actions taken by her between May 10, 2006, and January 11, 2007, in order to obtain said discovery"; and (3) certify to the court that between May 10, 2006, and January 11, 2007, plaintiff's counsel made reasonable and good faith efforts to reach an agreement with defendants' counsel and that, despite said efforts, defendants failed to produce the requested evidence." <u>Id.</u>

14

Plaintiff has failed to supplement her opposition to the motion to dismiss as ordered by the court. Although defendants' stallwalling discovery tactics leave much to be desired, plaintiff has failed to show that she prosecuted her discovery requests between May 10, 2006, and January 11, 2007 and that defendants refused to provide the requested discovery during that period of time. Inasmuch Curran has not presented any justification for not actively pursuing her discovery requests for a period in excess of six months, it is recommended that her request to have the motion to dismiss summarily denied for failure to produce jurisdictional discovery be DENIED.

**B.     Dismissal of the complaint for failure to satisfy minimum contact requirements.**

**1.     Personal jurisdiction and minimum contacts.**

Personal jurisdiction over a defendant can be general or specific. Lang v. Corporación de Hoteles, S.A., 522 F.Supp.2d 349, 359 (D.P.R. 2007) (citing Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998)); Steen Seijo, 425 F.Supp.2d at 198 (citing Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994)). "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." United Elec. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992). Specific jurisdiction, on the other hand, exists "where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." Id. at 1088–89. Although Curran does not explicitly state whether she alleges the existence of general or specific personal jurisdiction, the opposition to the request for dismissal can be construed as attempting to establish specific *in personam* jurisdiction only. (See Docket No. 68). Therefore, the court will limit its discussion to that type of personal

15

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

jurisdiction. See Steen Seijo, 425 F.Supp.2d at 198 ("In the instant case, the plaintiffs only attempt to establish the existence of specific *in personam* jurisdiction ..., so the Court will circumscribe to discussing that type of personal jurisdiction.")[5]

In diversity cases, "personal jurisdiction over a non-resident defendant is determined according to the long-arm statute of the forum in which the federal district court sits." Id. (citing Pizarro v. Hoteles Concorde Int'l, 907 F.2d 1256, 1258 (1st Cir. 1990)). "The exercise of specific *in personam* jurisdiction pursuant to the state long-arm statute must fall within constitutional bounds." Steen Seijo, 425 F.Supp.2d at 198 (citing Pritzker, 42 F.3d at 60; Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 207 n. 9 (1st Cir. 1994)).  Therefore, in order to exercise specific jurisdiction properly, two requirements must be met: (1) the forum state must have a long-arm statute that grants jurisdiction over defendant; and (2) the exercise of jurisdiction under that statute cannot exceed constitutional limits.  Lang, 522 F.Supp.2d at 359 (citing Pritzker, 42 F.3d at 60)).

Rule 4.7 of the Puerto Rico Rules of Civil Procedure contains Puerto Rico's long-arm statute, and provides in part as follows:

> (a) Whenever the person to be served is not domiciled in Puerto Rico, the General Court of Justice shall take jurisdiction over said person if the action or claim arises because said person:
>
> > (1) Transacted business in Puerto Rico personally or through an agent; or
> >
> > (2) participated in tortious acts within Puerto Rico personally or through his agent[.]

---

[5] General jurisdiction is not applicable in this case because no allegation has been made that RGI, HMP and the Suggs were engaged in continuous and systematic activity in Puerto Rico unrelated to this suit.

16

PR Laws Ann. tit. 32, App. III, Rule 4.7(a).

In order to determine whether personal jurisdiction can be obtained under Rule 4.7(a), three elements must be present: (1) there must be an act done or consummated within the forum by the nonresident defendant; (2) the cause of action must arise out of the defendant's action within the forum state; and (3) the activity linking defendant, forum and cause of action must be substantial enough to meet the due process requirements of "fair play and substantial justice." Steen Seijo, 425 F.Supp.2d at 199 (citing Escude Cruz v. Ortho Pharmaceutical Corp., 619 F.2d 902, 904-05 (1st Cir. 1980); A.H. Thomas Co. v. Superior Court, 98 D.P.R. 864, 870 (1970)). In that manner, due process "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." Lang, 522 F.Supp.2d at 358-59; Steen Seijo, 425 F.Supp.2d at 199 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 289, 297 (1980); International Shoe Co., 326 U.S. 310, 316 (1945).

In order to determine whether minimum contacts exist to grant the court specific personal jurisdiction, the First Circuit employs a three pronged analysis:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities [the relatedness test]. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable [purposeful availment test]. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable [reasonableness test or Gestalt factors].

Pritzker, 42 F.3d at 60-61.[6]  "Critically, '[a]n affirmative finding on each of the three elements of the test is required to support a finding of specific jurisdiction.'"  Negrón-Torres v. Verizon Communications, Inc., 478 F.3d 19, 24 (1st Cir. 2007) citing Phillips Exeter Academy v. Howard Phillips Fund, 196 F.3d 284, 288 (1st Cir. 1999).

The first prong of the minimum contact analysis, the relatedness test, "is a flexible standard that guarantees the evaluation of the element of causation in due process investigation." Steen Seijo, 425 F.Supp.2d at 200 (citing Ticketmaster, 26 F.3d at 206-207).  This test requires that there be a connection of proximate cause between the defendants' contacts and the plaintiffs' claim. Lang, 522 F.Supp.2d at 361 (citing Nowak v. Tak How Investments, Ltd., 94 F.3d at 715.)  That is, "[t]he claim may not arise out of the general relationship between plaintiff and defendant; rather, the cause of action 'must directly arise out of the specific contacts between the defendant and the forum state." Rodríguez Salgado v. Les Nouvelles Esthetiques, 218 F.Supp.2d 203, 207 (D.P.R. 2002) (quoting Phillips Exeter Academy v. Howard Phillips Fund, 196 F.3d 284, 290 (1st Cir. 1999); Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995)).  If the relatedness test is not met, the court is not required to address the remaining prongs of the minimum contacts jurisdictional analysis.  See Hainey v. World AM Commc'ns, Inc., 263 F.Supp.2d 338, 342 (D.R.I. 2003) (citing United Elec. Radio and Mach Workers of America v. 163 Pleasant Street Corp., 960 F.2d 1080, 1091 n. 11)).

---

[6] With respect to the third prong, the Supreme Court originally applied these factors in World-Wide Volkswagen, 444 U.S. 286, but without referring to them as "Gestalt factors."  The "Gestalt" name was first used in Donatelli v. National Hockey League, 893 F.2d 459, 464 (1st Cir. 1990), and has been included as part of the personal jurisdiction analysis since then.  Gestalt is translated from German to mean "form", "figure", or "shape."  See New Comm Wireless v. SprintCom, Inc., 213 F.Supp.2d 61, 68 n. 5 (D.P.R. 2002).

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

The second hurdle of the analysis is the purposeful availment test, which is fulfilled "when a defendant purposefully avails himself of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of its laws and making their presence before the forum court foreseeable."  Steen Seijo, 425 F.Supp.2d at 200 (citing 163 Pleasant St. Corp., 960 F.2d at 1089).  The purpose of this test is to ensure that a defendant "will not be pulled into a jurisdiction as a result of random, fortuitous or attenuated contacts, or of the 'unilateral activity of another person or a third person.'"  Steen Seijo, 425 F.Supp.2d at 200 (citing Burger King v. Rudzewicz, 471 U.S. 462, 475 (1985); Helicópteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417 (1984); World-Wide Volkswagen Corp., 444 U.S. at 299).  Thus, "[t]he foreseeability aspect of purposeful availment prong requires that a defendant have 'fair warning' that his actions may subject him to jurisdiction in a particular forum." Portugues v. Venable LLP, 497 F.Supp.2d 295, 299 (D.P.R. 2007).  "[T]he courts must look beyond formalistic measures like physical presence in the forum or number of instances of contact with the forum and 'evaluate the nature of the contacts and, relatedly, the degree to which they represent a purposeful availment of the forum's protections and benefits.'" Steen Seijo, 425 F.Supp.2d at 200 (quoting Pritzker, 42 F.3d at 62).  Foreseeability and voluntariness are the two essential elements of the purposeful availment test.  Ticketmaster, 26 F.3d at 207. Furthermore, in order to show voluntariness, the plaintiff must show that the defendant "actually reached out to the plaintiff's state of residence to create a relationship." Portuges, 497 F.Supp.2d at 299 (citing Phillips Exeter Acad., 196 F.3d at 292; Brian Jackson & Co. v. Eximias Pharm. Corp., 248 F.Supp.2d 31, 35-36 (D.R.I. 2003)) (emphasis in original).

The last step faced by one who claims that the court has personal jurisdiction over a

19

defendant is showing that the exercise of such jurisdiction is reasonable.  Courts use the Gestalt factors "to put into sharper perspective the reasonableness and fundamental fairness of exercising jurisdiction in particular situations." Pritzker, 42 F.3d at 64.  The Gestalt factors include: (1) "the burden on the defendant," (2) "the forum State's interest in adjudicating the dispute," (3) "the plaintiff's interest in obtaining convenient and effective relief," (4) "the interstate judicial system's interest in obtaining the most effective resolution of controversies," and (5) the "shared interest of the several States in furthering fundamental substantive social policies." Burger King, 471 U.S. at 477-78 (citing Volkswagen, 444 U.S. at 292). These factors "are not ends in themselves, but they are, collectively, a means of assisting courts in achieving substantial justice" Steen Seijo, 425 F.Supp.2d at 201 (quoting Ticketmaster, 26 F.3d at 209).  The consideration of the Gestalt factors may render jurisdiction unreasonable, even when a defendant has purposefully directed his activities at the forum resident:  "Most such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional.  Nevertheless, minimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." Steen Seijo, 425 F.Supp.2d at 201 (citing Volkswagen, 444 U.S. at 292).

### 2.        Analysis of the circumstances of the case at bar.

Based on the documents attached to the complaint, Curran claims that the court has personal jurisdiction over defendants because the RadiaGuard Business Plan states that HMP:

> owns and distributes Radia-Guard, a line of products developed to help protect the skin of patients undergoing radiation therapy. Radia-Guard was developed as a result of several years experience with developing a medical market for a similar product.

20

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

> Our expertise in this arena has resulted in obtaining more than 350 cancer center
> clients throughout the United States and Puerto Rico.

(Docket No. 1-5, at 1) (emphasis added).  The RadiaGuard Business Plan also states that HMP's principal executives "presently have contacts and accounts in over 500 centers in the United States and Puerto Rico."  Id., at 2.  Furthermore, said plan specifies that the Suggs and Curran form part of HMP's management and refers to them as the "business owners."  In particular, Ms. and Mr. Sugg are, respectively, HMP's and RGI's president and vice president.  (Docket No. 33-3 (Sugg's Aff., ¶¶ 2-3.))  As to Curran, the RadiaGuard Business Plan states that she "brings many talents to the company", that she has "a strong background in business and product development as well as sales and marketing", that she "has spent many years bringing products into the medical and oncology market, and was recently involved in establishing a new product into the radiation therapy arena" and that she "works full time developing the business and marketing of Radia-Guard."  Id., at 6-7.[7]

In order to determine whether defendants have sufficient contacts with Puerto Rico to allow the court to exercise personal jurisdiction over them, the court must consider the evidence submitted by plaintiff within the context of the claims and causes of action alleged in the complaint.   As dictated by the First Circuit's tripartite minimum contacts jurisdictional test, the court begins its analysis with the application of the relatedness test to each of plaintiff's causes of action.  In this case, the causes of action raised by Curran in the complaint essentially revolve around three principal claims: (1) defendants' breach of the alleged employment contract or business relationship with

---

[7] The May 9, 2005, letter from Ms. Sugg to Curran informing her that RGI was withdrawing the offer to issue stock to Curran and terminating her "business relationship" with RGI, was sent to plaintiff's address in Isla Verde, Carolina.  (Docket No. 1-15.)

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

Curran; (2) defendants' purported noncompliance and misrepresentations regarding the promise to give stock certificates to Curran; and (3) the validity and enforceability of the Confidentiality and Non-Solicitation Agreement.

The first cause of action asserted in the complaint seeks declaratory relief invalidating the Confidentiality and Non-Solicitation Agreement *ab initio*. (Docket No. 1, ¶¶ 153-61.) This cause of action is based on the allegations that: (1) Curran never received the stock certificate in exchange for which she executed the Confidentiality and Non-Solicitation Agreement (Id., ¶ 154); (2) Curran "never received either any employment or professional services agreement from ... RGI and was never compensated for her services to ... RGI" (Id., ¶ 155); and (3) the Confidentiality and Non-Solicitation Agreement is void *ab initio* under the laws of Puerto Rico and Georgia because it establishes restrictions that are broader than necessary to protect the business interests of RGI. (Id., ¶¶ 156-61; see also Docket No. 1-13).

The documents attached to the complaint do not evince or suggest that the specific actions upon which Curran bases the allegations of the first cause of action are linked to defendants' activities in this forum. Actually, the specific allegations of the complaint suggest the opposite. The complaint specifically alleges that in late April, 2005, Curran requested a meeting with the Suggs in Georgia to discuss the future of plaintiff's business relationship with them. (Docket No. 1, ¶122.) It was at this meeting in Georgia that Curran allegedly presented Ms. Sugg with a proposal for licencing the New Products for all international markets and where they drafted, negotiated and executed said licensing agreement. Id., ¶¶ 126-28. The complaint further alleges that it was in Georgia where Ms. Sugg advised Curran that the stock certificate for her share of stock in RGI

<u>Barbara Curran v. Radiaguard International, Inc., et al.,</u>
Civil No. 05-1725 (ADC/MEL)
<u>Report and Recommendation</u>

would not be delivered until plaintiff executed the Confidentiality and Non-Solicitation Agreement

and where Curran signed the agreement.  <u>Id.</u>, ¶¶ 133-35.  It was also at this meeting, according to the

complaint, where Ms. Sugg slipped the purported Share Certificate into various papers on top of

Curran's briefcase.  <u>Id.</u>, ¶¶ 137-39.  Therefore, irrespective of the substantive merits of plaintiff's

allegation that the Confidentiality and Non-Solicitation Agreement is void <i>ab initio</i> under the laws

of Puerto Rico and Georgia, even if the allegations of the complaint are assumed <i>arguendo</i> to be

true, all the events surrounding said agreement and the stock certificate appear to have occurred in

Georgia, not in Puerto Rico.  Thus, plaintiff's first cause of action is not substantially related to

defendants' actions within this forum.[8]

Curran's second cause of action is for injunctive relief.  <u>Id.</u>, ¶¶ 162-75.  She seeks the court

to permanently enjoin defendants from: (1) communicating in any way with Curran, with Anthony

Catanese, or with any person, firm or organization to disparage Curran of her "Future Business";

---

[8] Although Curran requests that the Confidentiality and Non-Solicitation Agreement be declare null and void <i>ab initio</i>, said agreement contains the following forum selection clause: "The parties agree that this Agreement will be governed by the laws of the State of Georgia.  Suits relating to this Agreement shall be brought in the state courts of Fulton County, Georgia, or the United States District Court for the Northern District of Georgia, Atlanta Division, and the parties irrevocably consent to the venue and jurisdiction of such courts."  (Docket No. 1-13, § 5(e).)

As a rule, forum selection clauses are <i>prima facie</i> valid and should be enforced unless the party opposing its enforcement shows that such enforcement is unreasonable under the circumstances of the case.  <u>M/S Bremen v. Zapata Off-Shore, Co.</u>, 407 U.S. 1, 10 (1972).  "Under First Circuit standards, a party opposing the enforcement of a forum selection agreement must show that the particular clause: (1) was not freely negotiated or was the result of fraud; (2) contravenes a strong public policy of the forum where the suit is brought; or (3) the party challenging its enforceability shows that trial in the contractual forum will be so gravely difficult and inconvenient that it will, for all practical purposes, be deprived of its day in court."  <u>Intercall Telecommunications, Inc. v. Instant Impact, Inc.</u>, 376 F.Supp.2d 155, 160 (D.P.R. 2005) (citing <u>Miró González v. Avatar Realty, Inc.</u>, 177 F.Supp.2d 101, 104 (D.P.R.2001); <u>M/S Bremen</u>, 407 U.S. at 18 ( 1907).  Furthermore, forum selection clauses are deemed to be separate from, and independent of, the contract containing it.  Thus, if the forum selection clause is not vitiated by fraud or otherwise unenforceable, then any other controversy related to the underlying contract must be entertained in the contractually designated forum.  <u>Intercall Telecommunications, Inc. v. Instant Impact, Inc.</u>, 376 F.Supp.2d 155, 160 (D.P.R. 2005)

(2) "taking any action in any court in any jurisdiction to disrupt, prevent, or harm [Curran] and/or [Curran's] Future Business"; and (3) "[a]ttempting to enforce by any means or in any way and in any court in the State of Georgia, the Commonwealth of Puerto Rico, or any other jurisdiction the Confidentiality and Non-Solicitation Agreement." Id., ¶ 175(A)-(C).[9] This cause of action is based on plaintiff's "fear that the defendants will seek to harm her in her efforts to develop [p]laintiff's Future Business" by enforcing the Confidentialy and Non-Solicitation Agreement. Id., ¶¶ 165, 169. Inasmuch this cause of action is inextricably related to the Confidentiality and Non-Solicitation Agreement, and all events regarding said agreement occurred in Georgia, not in Puerto Rico, plaintiff's second cause of action for injunctive relief is not related to and does not arise from defendants' actions within this forum.

Finally, the third and fourth causes of action allege breach of contract, fraud and misrepresentation. Id., ¶¶ 176-198.[10] These causes of action are based on the allegations that defendants made various promises to remunerate and compensate Curran as part of her employment agreement or business relationship with them and that she would receive shares of stock of RGI and HMP, as allegedly evidenced by the Licencing Agreement and by the HMP Agreement. Id. As per the allegations of the complaint, Curran met the Suggs during a distributors meeting in Los Angeles, California. Id., ¶18. During this meeting the Suggs approached Curran to work with them and their

---

[9] The complaint defines plaintiff's "Future Business" as Curran's efforts following defendants' repudiation of the Licensing Agreement "to obtain financing in order to build a new business dedicated to developing, marketing, and selling skin care products to a market which is similar to the ones in which she has worked for many years, including products similar to those included among the Radx Products and the New Products, which she marketed for and developed for defendants." (Docket No. 1, ¶ 163.)

[10] The complaint contains a fifth cause of action for intentional infliction of emotional distress. (Docket No. 1, ¶¶ 199-200.) Said cause of action is based on the aforementioned causes of action.

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

new corporation in the marketing and distribution of the Radx Products. Id., ¶ 20. According to the

complaint, from that moment and until January 2004, Curran "was employed by the Suggs as a sales

representative for Radx Marketing Division, developing leads and obtaining customers for Radx

Products in the Puerto Rico market and in the United States." Id., ¶ 21. Curran has failed to present

evidence as to where did defendants negotiated and made the promises to remunerate and

compensate her. However, assuming once again *arguendo* the allegations of the complaint to be

true, if an employment contract existed between Curran and defendants, a reasonable reading of the

complaint indicates that the same was brought into existence at Los Angeles, California, not Puerto

Rico.

With respect to the Licensing Agreement that allegedly evidences the promise to give Curran

stock certificates in RGI, said agreement provides that once executed, "Barbara Curran will return

25% of her ownership stock shares of [RGI] and will keep 10% ownership shares." (Docket No. 1-

12.) This Licensing Agreement, however, fails to show a specific contact between defendants'

commercial activities in this forum and the third and fourth causes of action asserted by Curran.[11]

Furthermore, all the significant events surrounding the Licensing Agreement also occurred in

Georgia, not in Puerto Rico.

With respect to defendants' representations that Curran had stock in HMP, plaintiff presents

no evidence of the HMP Agreement, of its content, and where and how it was negotiated and

---

[11] The Licensing Agreement covered "all business conducted internationally under the name of [RGI]." It also stated that Curran "will form a new LLC for any and all international business that she will control" and that she agreed to "continue to help with the domestic operations and work with them at domestic trade shows." (Docket No. 1-12.) The agreement, however, does not define "domestic operations", "domestic trade shows" and "business conducted internationally" and does not state whether the Puerto Rico market falls into any of these categories.

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

executed.  Thus, the evidence is insufficient to show that plaintiff's causes of action for breach of

an employment contract, fraud and misrepresentation are substantially related to defendants' actions

within this forum.

In the opposition to the motion to dismiss, Curran contends that all of the events alleged in

the complaint "occurred precisely because of the commercial activities of HMP - and later RGI - and

of the Suggs, in Puerto Rico."  (Docket No. 68, at 12.)  Curran also alleges that her work in Puerto

Rico was the main consideration of the HMP and RGI Agreements, and that "RGI was created on

[p]laintiff's insistence to ... the Suggs that the RadiaGuard Products be marketed in Puerto Rico, and

internationally, through a new corporation, other than ... HMP, which was not burdened by the Radx

Debt, so as to encourage investors to invest in the RadiaGuard Business."  Id., at 13-14.  Curran,

however, fails to present sufficient evidence to support these claims.  Furthermore, the complaint

lacks the specific allegations that the causes of action alleged therein are the result of HMP's, RGI's

or the Sugg's commercial activities in Puerto Rico and that the main consideration of the HMP and

RGI agreements was plaintiff's work in Puerto Rico.[12]  Similarly, although the complaint alleges that

RGI was created because of Curran's insistence that the New Products be marketed through a

corporation not burdened by the Radx Debt, it does not allege that the marketing would be

specifically done in Puerto Rico.  (See Docket No. 1, ¶ 68.)

The fact that the May 9, 2005, letter from Ms. Sugg to Curran informing her that RGI was

withdrawing the offer to issue stock to Curran and terminating her "business relationship" with RGI

---

[12] Just as with the HMP Agreement, Curran presents no specific evidence of the RGI Agreement, of its content and where and how it was negotiated and executed.

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

was sent to plaintiff's address in Isla Verde, Carolina is, in and of itself, insufficient to conclude that defendants have minimum contacts in Puerto Rico. In U.S.S. Yachts, Inc. v. Ocean Yachts, Inc., 894 F.2d 9 (1st Cir.1990), the First Circuit Court of Appeals determined that three letters sent by a non resident corporation to Puerto Rico were insufficient to warrant the exercise of *in personam* jurisdiction. Id., at 11-12; see also Arce v. Aramark, 239 F.Supp.2d 153 (D.P.R. 2003).

A sworn statement under penalty of perjury executed by the Suggs states that: (1) the Suggs have never been to Puerto Rico or owned real property in Puerto Rico; (2) the Suggs have never maintained or operated an office or business in Puerto Rico; (3) the Suggs have never opened bank accounts in Puerto Rico and have no assets in Puerto Rico; (4) HMP and RGI have never applied for authorization to conduct business in Puerto Rico, and have never owned real property in Puerto Rico; (5) HMP and RGI have never maintained and/or operated corporate or business offices in Puerto Rico; (6) HMP and RGI have never opened bank accounts in Puerto Rico and have no assets in Puerto Rico; and (7) all substantial events giving rise to the claims in the complaint took place in the State of Georgia, including the preparation and execution of the Licensing Agreement, the Confidentiality and Non-Solicitation Agreement, and the preparation of documents such as the Radiaguard Business Plan. (Docket No. 33-2 (Sugg's Aff.))  Curran has not brought to the court's attention sufficient evidence outside of the allegations of the complaint contradicting the Suggs' sworn statement, a fact further bolstering the conclusion that minimum contacts are not present in this case. See Villa Piano Corp. v. Crest Audio, Inc., 20 F.Supp.2d 293, 295 (D.P.R. 1998) (plaintiff failed to establish that manufacturer had requisite "minimum contacts" with Puerto Rico to support personal jurisdiction in breach of contract action; evidence submitted by defendant through a

27

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

statement under penalty of perjury, not contested by plaintiff, showed that defendant never had any

officers or other business facilities in Puerto Rico, nor any address or telephone listing, it never

owned, leased or had interest in real or personal property within jurisdiction, nor had it ever

maintained any local bank, savings and/or loan accounts or made investments there, nor did it hold

licenses of any kind issued by or for Puerto Rico and had never maintained any employees there).

In summary, a reading of the complaint and the evidence submitted by the parties reveals that

Curran's claims do not arise directly from her business actions in Puerto Rico but, rather, from the

events occurring outside Puerto Rico, namely, her meetings with and visits to the Suggs in Georgia

and Los Angeles, California.   In particular, although Curran alleges to have conducted business in

Puerto Rico on behalf of defendants, she fails to present enough affirmative evidence that the causes

of action alleged by Curran in the complaint are sufficiently related to the business conducted by

defendants in Puerto Rico.  Hence, defendants contacts with Puerto Rico are not substantially related

to the causes of action asserted by Curran and  insufficient to allow the court to exercise personal

jurisdiction over RGI, HMP and the Suggs.[13]

It is therefore recommended that defendants' motion to dismiss for lack of personal

jurisdiction and failure to satisfy the due process minimum contact requirements be GRANTED.[14]

IT IS SO RECOMMENDED.

---

[13] Having determined that the causes of action raised in the complaint do not survive the relatedness test, it is unnecessary for the court to entertain an analysis as to the purposeful availment test and the Gestalt factors.  See Hainey, 263 F.Supp.2d at 342.

[14] In light of this recommendation, it is unnecessary to entertain an analysis as to the remaining grounds upon which defendants request dismissal of the complaint, namely, lack of indispensable parties and improper venue.

Barbara Curran v. Radiaguard International, Inc., et al.,
Civil No. 05-1725 (ADC/MEL)
Report and Recommendation

The parties have ten (10) business days to file any objections to this report and recommendation.  Failure to file same within the specified time waives the right to appeal this order. Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986)

San Juan, Puerto Rico, this 9th day of October, 2008.

s/Marcos E. López
U.S. MAGISTRATE JUDGE

29